## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**JAMES L. HALL,**
         **Petitioner,**

**v.**                                                    **Case No.  5:06cv30/RS/MD**

**JAMES R. MCDONOUGH,**
         **Respondent.**

_____

## REPORT AND RECOMMENDATION

        Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  (Doc. 1).  Respondent filed an answer, submitting relevant portions of the state court record.  (Docs. 25, 26).  Petitioner has replied.  (Doc. 34).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

        In 1993 petitioner was charged in the Circuit Court of Escambia County, Florida, with the first degree murder (Count 1) and armed robbery (Count 2) of Frank White.  (Doc. 9, ex. A).  He was convicted upon jury verdict of both offenses, and

sentenced on Count 1 to life in prison with no possibility of parole for 25 years, and on Count 2 to 10 consecutive years.  (*Id.*, ex. B).  His conviction and sentence were affirmed on appeal.  *Hall v. State*, 643 So.2d 1085 (Fla. Dist. Ct. App. 1994). Thereafter, petitioner filed a motion for post-conviction relief based on newly discovered evidence which resulted in a new trial being ordered.  (*Id.*, ex. C).

The second trial commenced on December 17, 2001, and two days later petitioner was again convicted upon jury verdict of first degree murder and robbery with a firearm.  (*Id.*, exs. D & E).  He was sentenced to life in prison for the murder, with a consecutive sentence of ten years for the robbery.  (*Id.*, ex. E; doc. 26, ex. N). On August 29, 2003 the Florida First District Court of Appeal ("First DCA") affirmed petitioner's convictions, but certified a question of great public importance to the Florida Supreme Court.   In addition, the appellate court vacated petitioner's sentence as to the first degree murder and remanded with instructions to correct the judgment and sentence to conform to the trial court's oral pronouncement of life in prison with no possibility of parole for 25 years, rather than life in prison with no possibility of parole.  *Hall v. State*, 853 So.2d 546 (Fla. 1st Dist. Ct. App. 2003) (copy at doc. 26, ex. R).[1]  On October 16, 2003 the trial court issued an order correcting the judgment and sentence.  (Ex. T).  Thereafter, petitioner filed a Notice to Invoke the Discretionary Jurisdiction of the Florida Supreme Court.  (Ex. U).  On December 18, 2003 the Florida Supreme Court declined jurisdiction.  *Hall v. State*, 865 So.2d 480 (Fla. 2003) (Table) (copy at ex. X).[2]  Petitioner did not seek review in the United States Supreme Court.

On January 13, 2005 petitioner filed a motion for post-conviction relief pursuant to FLA. R. CRIM. P. 3.850.  (Ex. W).  The trial court denied relief.  (Ex. V).[3]  On October 28, 2005 the First DCA affirmed the denial order without written opinion.

---

[1]Hereafter all references to exhibits will be to those provided at doc. 26 unless otherwise noted.

[2]Respondent's Index to Appendix identifies this opinion as Exhibit V; however, it actually appears as Exhibit X.

[3]Respondent's Index to Appendix identifies this order as Exhibit X; however, it actually appears as Exhibit V.

*Hall v. State*, 915 So.2d 1199 (Fla. 1st Dist. Ct. App. 2005) (Table) (copy at ex. AA). Petitioner filed a motion for rehearing, (ex. BB), which the First DCA denied on December 1, 2005.  (Ex. CC).  The mandate issued December 19, 2005.  (Ex. DD).

Petitioner filed the instant federal habeas petition on January 30, 2006.  (Doc. 1).  Respondent filed a motion to dismiss the petition as time-barred.  (Doc. 8).  The motion was denied on August 21, 2006.  (Docs. 14, 15).

## DISCUSSION

### Exhaustion and Procedural Default

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[4] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, *supra*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78.

---

[4]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A)  the applicant has exhausted the remedies available in the courts of the State; or

(B) (i)  there is an absence of available State corrective process; or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In *Picard v. Connor*, *supra*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.* at 278, 92 S.Ct. at 513, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7, 103 S.Ct. at 278 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)). The only manner in which the habeas petitioner had cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7, 103 S.Ct. at 278 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. 459 U.S. at 7 and n. 3, 103 S.Ct. at 278 and n. 3.

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry*, *supra*. The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[5] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 115 S.Ct. at 888. More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004). The *Baldwin* Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* This language, while not part of the Court's holding, provides an instructive and useful rule of thumb. With regard to this statement, the Eleventh Circuit stated in *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" *McNair [v. Campbell]*, 315 F. Supp. 2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d

---

[5]The petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

598 (1986)).  This is consistent with settled law established by the Supreme Court. . . .  We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

*Id.*, 416 F.3d at 1302-03 (citations omitted).[6]

The Eleventh Circuit, prior to *Duncan*, had broadly interpreted the "fair presentation" requirement.[7]  However, after *Duncan*, the Eleventh Circuit has taken a more restrictive approach.  For example, in *Zeigler v. Crosby*, the Circuit Court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the Federal Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003).  The court specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause.  *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the

---

[6]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  *Id.*

[7]*See, e.g., Watson v. Dugger*, 945 F.2d 367 (11th Cir. 1991) (finding issue to be exhausted when petitioner argued in state court that trial court misapplied state law when it refused to give petitioner's requested jury instruction and thereby allowed the jury to convict without necessary showing of criminal intent, and argued in federal court that this was a due process violation); *Mattox v. Dugger*, 839 F.2d 1523 (11th Cir. 1988) (holding that a federal habeas corpus petition should not be dismissed on grounds of procedural default when a petitioner has previously brought an issue before a state court alleging only state law violations, when such a claim is equally supported by federal law, and the state cites such federal law in support of its position); *Hutchins v. Wainwright*, 715 F.2d 512, 518-19 (11th Cir. 1983) (petitioner exhausted Sixth Amendment confrontation clause claim in state court by raising hearsay objections, even though petitioner never raised Sixth Amendment claim in state court).

United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." *Id.*

An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review.  *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey*, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be firmly established and regularly followed, that is, not applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  *Ford v.*

*Georgia*, 498 U.S. 411, 424-25, 111 S.Ct. 850, 858, 112 L.Ed.2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. *Tower v. Phillips, supra.* To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 85, 130 L.Ed.2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

<u>Standard of Review</u>

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective

Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

120 S.Ct. at 1523 (O'Connor, J., concurring).  Under the test just described a habeas court does not examine the State court's ruling to see if it is correct, but examines it only to see if it is reasonable.  More recently, in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication

on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Id.*, 123 S.Ct. 1172.   The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v.* Nagle, 138 F.3d 917, 923 (11th Cir. 1998).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer,* 123 S.Ct. at 1173 (quoting *Williams v. Taylor*, 529 U.S. at 405-06, 120 S.Ct. at 1519-20).   The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*, 529 U.S. at 405-06).   If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.   The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521.   Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.   *Holland v. Jackson*, 542 U.S. 647, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider

evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); *see also Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (A state court decision involves an unreasonable application of clearly established Federal law if the State court decision "identifies the correct governing Supreme Court legal principle . . . but . . . 'refuses to extend the governing principle to a context in which the principle should have controlled.'" (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000))).

Section 2254(d)(1) requires more than mere error, and more even than clear error on the part of the State court before federal habeas relief may be issued. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) ("We may not grant respondent's habeas petition, however, if the state court simply erred. . . ."); *Lockyer, supra*, 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Early v. Packer*, 537 U.S. at 11, 123 S.Ct. at 366 (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law. . . ."); *Williams, supra*, 529 U.S. at 410-12, 120 S.Ct. at 1522-23 (The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion.").

Only if the federal habeas court finds the State court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims. *Neelley*, 138 F.3d 917.  Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court).

_____ Within this framework, the court will review petitioner's claims.

**Petitioner's Grounds for Relief**

      **Ground 1.**    **Denial of Effective Assistance of Counsel When Defense Counsel Elicited Prejudicial Testimony from State Witness Heather Atkins. (Doc. 1, p. 4).**

Petitioner asserts that his trial counsel was ineffective for eliciting testimony during cross-examination of the State's main witness Heather Atkins that petitioner threatened her and that she was in great fear. Petitioner complains that this testimony was "prejudicial" to the defense and should not have been presented to the jury. (Doc. 1, p. 4). Respondent concedes that petitioner exhausted his state court remedies with respect to this claim by presenting it in the Rule 3.850 proceeding. (Doc. 25, p. 13).

      **A.**    **Clearly Established Federal Law**

In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's performance." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*). In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance. *Chandler* at 1314. "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance: "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance." *Waters* [*v. Thomas*, 46 F.3d 1506], 1522 (en banc). Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness. *Chandler* at 1314 (footnote omitted). Moreover, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment.

*Chandler* at 1314 n.15.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S.Ct. at 2067. Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. at 2068. Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not

sufficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

## B.   Federal Review of State Court Decision

After citing the *Strickland* standard and accurately stating what that standard requires, (ex. V, pp. 36-37), the state court denied relief as follows:

> Initially, under *Strickland*, the Court is not convinced that counsel was ineffective for eliciting the testimony. A review of the entire cross-examination reveals that the information was elicited as one of many inconsistencies pointed out in Atkins's testimony by counsel. Defense counsel launched an unrelenting attack on Atkins's credibility. Counsel inquired of whether Atkins had participated in a automobile theft and whether she was a frequent runaway as a teenager. Immediately after the exchange of which Defendant complains in his instant claim, defense counsel pointed out through further questioning that Atkins had stayed in a hotel with Defendant for approximately a week after the murder, and had "plenty of times" for her to "get away" from him. Counsel further pointed out that the police came into contact with her and Defendant in Port St. Joe after the murder, and she never mentioned being in fear to the officers. Counsel went on to point out more inconsistencies between Atkins's testimony in the two trials, and also introduced letters written by Atkins to Defendant while he was incarcerated, in which she proclaimed her love for Defendant. Additionally, counsel questioned Atkins about her conviction as an accessory after the fact, and the fact that she received only a brief house arrest sentence for her part in the crime, shortly after she testified at the first trial. Defense counsel also asked Atkins about several statements that she was alleged to have made regarding the murder such as, "I'm glad I got away with it," "[Defendant] was willing to take the fall and I was not," "[A] man is better equipped to handle prison" than a woman, and, in her prior testimony, that she had told someone that "nobody expected I was the shooter so I never volunteered otherwise" and "I got away with it." Atkins denied making each of these statements; therefore, defense counsel also called

witnesses who testified that Atkins had, in fact, made each of these statements. Furthermore, in closing defense counsel used the testimony to illustrate that Atkins's testimony that she was scared made no sense in light of the circumstances, and thus further undermined her credibility. Accordingly, based on the weight of the evidence regarding Atkins's credibility, the Court is not convinced that counsel's performance was deficient in eliciting the testimony. Rather, as illustrated by counsel's use of the testimony in closing argument, it appears that the testimony of which Defendant complains was part of a concerted effort to paint Atkins as a dishonest witness who would say whatever was beneficial to her. Additionally, in light of the evidence, the Court does not find that the result would have been different had the testimony been omitted. As to the jury's perception of Defendant's propensities, the State presented testimony that Defendant had stolen a car from his uncle, robbed a fruit stand in Georgia shortly before the crime in the instant case in which the victim was forced to her knees at gunpoint, and that he shot the victim in the instant case in order to steal his wallet and watch. Testimony was also offered that Defendant and Atkins camped out in the woods in Pennsylvania to avoid apprehension, and that Defendant instructed Atkins to tell the police that the victim attempted to rape her and that he had been shot in self-defense. Testimony was also offered that Defendant admitted to a fellow inmate that "he killed an elderly man" and that when his girlfriend Atkins became hysterical at the scene of the crime, he "told her to shut up or I'll kill you." Therefore, other evidence was presented to the jury regarding the propensities of the Defendant, and more importantly, the threat testified to by Atkins was testified to by another witness. Consequently, the Court cannot find that the result at trial would have been different had counsel not inquired of Atkins regarding the threats made by Defendant. Defendant is not entitled to relief on this basis.

(*Id.*, pp. 38-41) (footnoted references to trial transcript omitted).

Thus, the trial court found that it was defense counsel's strategy to attack Atkins' credibility on as many fronts as possible, thereby making it appear that Atkins was a dishonest witness who would say whatever was beneficial to her. The court further found that the questioning of which petitioner complains was in furtherance of that strategy. These findings, which the trial court supported with relevant portions of the trial transcript, are presumed correct. *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("Whether counsel's decision is tactical is a question of fact. . . ."); 28 U.S.C. § 2254(e)(1). Petitioner has not rebutted that presumption with clear and convincing evidence to the contrary.

Based on these findings, the state court concluded as a matter of law that petitioner could not establish that no competent counsel would have taken the action that defense counsel took. *See Chandler*, 218 F.3d at 1315. This conclusion was a reasonable application of *Strickland*. The victim, Frank White, was found in a bank parking lot in Pensacola, Florida, dead from two gunshot wounds to the head. (Doc. 26, ex. M, pp. 270-71, 381). State witness Heather Frank Atkins testified on direct examination that in August of 1992 she was living in Youngstown, Ohio with her foster mother. Petitioner lived in the same town, and the two were dating. One evening in the second week of August, petitioner and Atkins decided to go to Macon, Georgia where petitioner's grandparents lived. (*Id.*, pp. 140, 144). Petitioner picked up Atkins in his uncle's vehicle, which he had taken without his uncle's permission. (*Id.*, p. 140). The two had a black .380 pistol, which petitioner had purchased after his silver .380 pistol was stolen. (*Id.*, p. 143). They had no other guns with them. On the way to Georgia they stopped at a fruit stand. (*Id.*, p. 144). Petitioner got out, instructed Atkins to get in the driver's seat and stay in the car, and after a few moments returned to the car and told Atkins to drive. At some point the car broke down and they hitchhiked from Georgia to Alabama to Florida. (*Id.*, pp. 145-147). While hitchhiking in Florida they met Frank White. (*Id.*, p. 148). Mr. White picked them up and the three stopped at a bar in Pensacola for a drink. Since petitioner and Atkins were unfamiliar with the area, White referred them to a motel where he was staying and offered to drive them there, cautioning that they would have to pay for their own room. (*Id.*, p. 149). The three got in the front seat of White's car with White driving, Atkins in the middle, and petitioner in the passenger seat. (*Id.*, p. 150). Petitioner asked White to stop at an ATM so he could get money for the motel room. (*Id.*). Petitioner asked Atkins to retrieve the ATM card from her purse. Atkins bent down and was fumbling in her purse to get the card when she heard petitioner say either "give me your wallet" or "give me your money." (*Id.*, pp. 151, 179). Mr. White asked what was going on. She then heard a gunshot, the sound of gurgling to her left, and another gunshot. (*Id.*, p. 151). Petitioner got out of the car and went around to the driver's side door. (*Id.*, p. 152). He told Atkins to get Mr. White's wallet. Atkins refused. She turned to Mr. White and, seeing his condition, became

hysterical and moved to the passenger's side door.  Petitioner removed Mr. White from the car, took his wallet and watch, jumped in the car and sped away.  (*Id.*, pp. 152-53).  Atkins was still hysterical, and petitioner yelled at her to "shut the f--- up." (*Id.*, p. 154).  The two stopped at a motel and rented a room.  After they got in the room Atkins, still hysterical, laid down on the bed.  Petitioner proceeded to go in and out of the motel room, retrieving a number of items from the car including Mr. White's wallet and watch.  After opening Mr. White's wallet to count the money, petitioner reported, "We hit the jackpot, baby."  (*Id.*, p. 157).  Petitioner and Atkins left the motel the following morning.  They left the car there and headed toward Naples, Florida.  (*Id.*, pp. 157-61).  They eventually went back to Ohio and then on to Pennsylvania where they camped in the woods.   The two were arrested in Pennsylvania and transported back to Pensacola.  (*Id.*, pp. 162-63).  In the time between the shooting and their arrest, petitioner told Atkins that if they got arrested she was to tell authorities that Mr. White had tried to rape her and petitioner shot White in Atkins' defense.  (*Id.*, p. 166).  Atkins testified that at no time prior to the robbery and murder did petitioner tell her that he was going to rob Mr. White, shoot him or steal his wallet.  (*Id.*, pp. 152-53).

The theory of the defense was to discredit Ms. Atkins[8] and to suggest that based on the evidence presented by the State, "whatever happened to Mr. White could have been done just as well by Heather Frank [Atkins] as it was by James Hall."  (Ex. M, p. 531).[9]  During cross-examination of Atkins, defense counsel relentlessly attempted to impeach her credibility as described in the Rule 3.850 court's order.  As part of his questioning, defense counsel asked Atkins why she did not report the murder or attempt to get away from petitioner, reminding her that it

---

[8]As petitioner stated in his motion for post-conviction relief, "the impeachment of [Ms. Atkins'] testimony was essential to Mr. Hall's defense."  (Ex. W, p. 28).

[9]Indeed, although petitioner did not testify at the second trial, his trial testimony from the first trial was read to the jury at the second trial.  (*Id.*, pp. 266-69).  Petitioner's version of events was that he had merely stolen the victim's wallet from the dashboard of the car and run off, thinking Atkins would follow him, but instead, she remained in the car and shot the victim.  Petitioner decided that the two would make up a story that Mr. White had attempted to rape her and that petitioner shot Mr. White to protect her.  When they returned to Ohio, petitioner gave his gun to a friend named Pablo. Atkins told petitioner she was going to give her gun to petitioner's best friend.  (Ex. EE, pp. 391-435).

had been "a high point last time at trial . . . that you indicated that . . . you didn't try to get away from [Defendant] because he was threatening you and you were in great fear." (*Id.*, p. 180). After getting Atkins to acknowledge that that had been her prior testimony and that it was the truth, defense counsel succeeded in getting Atkins to admit that following the murder she had numerous opportunities to get away from petitioner and call the police, yet she did not. (*Id.*, pp. 180-81). Later, in closing argument counsel urged the jury to find Atkins' version of events incredible, reminding the jury of Atkins' acknowledgment that she spent days with petitioner following the murder and made no attempt to get away from him or report the incident to police. (*Id.*, pp. 540-41). By questioning Ms. Atkins on this point, counsel was able to reveal a number of inconsistencies between Atkins' present testimony and her past testimony and actions during the time of the incident. The undersigned cannot say that counsel's strategy fell outside the wide range of reasonable, professional assistance. It was not objectively unreasonable for the state court to find that counsel's conduct in this regard was reasonable.

Moreover, with regard to the alleged prejudicial effect of the jury hearing of Atkins' previous testimony that she was in fear of petitioner, the state court found that the prosecution had submitted evidence which was far more damaging to the jury's perception of petitioner than the testimony elicited by defense counsel. The record amply supports this finding.

The State presented testimony that petitioner stole a car from his uncle; that shortly before the murder and robbery of Mr. White petitioner robbed a fruit stand in Georgia in which he forced the victim to her knees at gunpoint, (ex. M, pp. 215-17, 233), and that petitioner shot Mr. White in order to steal his wallet and watch. The State also presented testimony that petitioner admitted to a fellow inmate that he killed an elderly man and that when his girlfriend became hysterical at the scene of the crime, he told her to shut up or he would kill her. (Ex. M, pp. 229-32). Based on these findings, it was not objectively unreasonable for the state court to conclude that petitioner failed to create a reasonable probability that but for counsel's conduct the result of the trial would have been different. The state court's denial of relief on

this claim was neither contrary to, nor an unreasonable application of the *Strickland* standard; therefore, petitioner is not entitled to federal habeas relief.

> Ground 2.      <u>Denial of Effective Assistance of Counsel When Defense Counsel Failed to Investigate and Call Two Witnesses Critical to the Defense.</u>  (Doc. 1, p. 4).

Petitioner asserts that defense counsel was ineffective when he failed to present the testimony of Pablo Rhodas and Damian Smolko.  According to petitioner, Rhodas would have testified that when petitioner and Atkins returned to Ohio after the murder, petitioner gave Rhodas the silver .380 pistol.  Petitioner states this would have shown that Ms. Atkins lied when she testified that the handgun had been stolen prior to her and petitioner leaving Ohio, thereby discrediting Ms. Atkins' testimony and indicating she had something to hide.  (Doc. 1, p. 4; doc. 26, ex. W, pp. 4-5).  Petitioner claims Smolko would have testified that Ms. Atkins, not petitioner, owned and possessed the black .380 handgun which was the murder weapon, and that this testimony would have: (1) discredited Atkins' testimony that the silver handgun was stolen prior to her and petitioner leaving Ohio; and (2) demonstrated that Atkins was in possession of a gun at the time of the offenses and thus could have committed them.  (Doc. 1, p. 4; doc. 26, ex. W, pp. 5-6). Respondent concedes that petitioner exhausted his state court remedies with respect to this claim by presenting it in the Rule 3.850 proceeding.  (Doc. 25, p. 24).

> A.      Clearly Established Federal Law

The clearly established Supreme Court law with regard to claims of ineffective assistance is set forth above.

> B.      Federal Review of State Court Decision

Petitioner raised this claim in Grounds 2 and 3 of his Rule 3.850 motion for post-conviction relief.  It was petitioner's contention that because Ms. Atkins was the State's key witness, it was important to discredit or impeach her testimony "at every juncture."  (*Id.*, p. 6).

The state court denied relief as follows:

> Defendant's position at trial was that Atkins was actually the individual who shot the victim in the instant case.  As a result, one issue at trial was whether Atkins and Defendant were both in possession of handguns on the date of the murder, August 25, 1992.

Atkins testified that only Defendant had a gun.  She stated that Defendant had purchased a black .380 pistol during the early part of August 1992, and that the silver .380 pistol that Defendant's mother had previously purchased for him had been stolen at the "end of July, beginning of August."  Therefore, the two had only one gun at the time of the crime, according to Atkins.  Only one gun, a black .380-caliber, was recovered when Atkins and Defendant were arrested in Pennsylvania.  At his first trial, Defendant testified that he had given his silver .380 gun to a friend "Pablo" (Pablo Rhodas), and that he had nothing to do with the black gun after the murder except for "clearing a jam" from it.  Defendant did not testify at his second trial, but his testimony from the first trial was read to the jury.  In his second claim, Defendant alleges that Rhodas should have been called to show that Defendant gave him the silver gun after the murder, thus demonstrating that Atkins was still in possession of the black gun (the murder weapon).  In his third claim, Defendant claims that witness Smolko could have been employed as a defense witness for a similar purpose, as he could have testified that he saw Atkins in possession of a black .380 handgun in August 1992, and that she told him that Defendant had purchased the handgun for her for her own protection.

Failing to present cumulative impeachment evidence does not necessarily constitute ineffective assistance.  State v. Riechmann, 777 So.2d 342, 356 (Fla. 2000); citing Valle v. State, 705 So.2d 1331, 1334-35 (Fla. 1997); Provenzano v. Dugger, 561 So.2d 541, 545-46 (Fla. 1990).

Evidence was presented on the issue of which individuals were in possession of weapons in August 1992.  The defense called Melissa Leone Rubin, who dated Smolko at the time.  Rubin testified that Atkins had shown her a black handgun in August 1992, acknowledging that it was hers, that [Defendant's was silver], and saying that she needed it for protection.  Rubin further testified that she went and got Smolko and made him leave with her at the time because Atkins was making her nervous with the gun.  The defense also offered the testimony of Aundrea Anderson [Williams], who said that "at one point [Atkins] had shown us that she had just gotten a gun, and then [Defendant] ended up showing that he had just -- he had one also.  I think he had his before, though.  But she had been saying, Oh you know, I got a gun for my protection, you know."  Anderson further testified that Atkins had shown her the black gun in August 1992, and that Defendant had also displayed a silver gun at the same time.

Based on the above, and taken in concert with the extensive impeachment of Atkins that the Court has already detailed, the Court finds that presentation of the additional witnesses would have been cumulative of information presented through Defendant and other

witnesses. Evidence was introduced to the jury indicating that Atkins was in possession of the black handgun in August 1992, and the jury received defendant's testimony that he had given the silver gun to Rhodas. Therefore, counsel was not deficient for failing to call two additional witnesses to testify to essentially the same matters. Furthermore, the Court is not convinced that the introduction of Rhodas's testimony would have produced a different result at trial, as the mere fact that Defendant gave the silver gun to Rhodas does not necessarily mean that Defendant could not have killed Mr. White with the black handgun. Therefore, the Court finds that Defendant has also failed to demonstrate prejudice in counsel's failure to call Rhodas.

Lastly, the record reveals that the Court questioned Defendant at the close of the defense case, as follows:

The Court: Is there any testimony or evidence that you wish -- now, there may have been things that they wanted to do that the Court didn't allow them to do, that's one thing, but is there anything that you wanted to put in front of the jury, evidence, testimony that has not been brought forward that you've asked your attorneys to do? Do you understand what I'm saying? Is there anything out there, is there any witness that you say I wish this witness had been called, but my attorney -- you know, anything like that?

Defendant: No. I believe we have got one last piece of evidence to put it [sic] now.

The Court: Okay. I just want to make sure that there is no witness or evidence testimony out there that you are saying if that had -- I would want that brought forward at the trial today.

Defendant: No ma'am.

The Court: Okay. So, I mean, I always ask this question at this point because satisfaction regarding attorneys potentially changes depending on verdict, but at this point, you are satisfied with the way your attorneys have represented you?

Defendant: Yes, ma'am.

Therefore, as the record reflects that counsel was not deficient, and indeed that Defendant was satisfied at the time with the choice of

witnesses called, Defendant is not entitled to relief on his second and third claims.

**(Ex. V, pp. 41-44) (footnoted references to trial transcript omitted).**

Petitioner has not shown by clear and convincing evidence that the state court's findings are unreasonable in light of the state court record. In fact, he has not challenged any of those findings. Based on these findings, the state court determined that the cumulative nature of the proposed evidence prevented petitioner from establishing deficient performance or prejudice under *Strickland*. This decision was not an unreasonable application of the *Strickland* standard. Assuming that counsel knew of Rhodas' and Smolko's proposed testimony and made a tactical decision not to call them, such strategy was not unreasonable, since the testimony would have been cumulative.

Granted, neither Melissa Leone Rubin nor Aundrea Anderson Williams testified that they saw the silver pistol <u>after</u> the robbery and murder; however, this minor elaboration of Rhodas was just that -- minor. The thrust of Rhodas' and Smolko's proposed testimony is the same as that of Anderson and Rubin - that Atkins was lying; that they saw Atkins with the murder weapon (the black pistol); that the black pistol was purchased for Atkins; and that Atkins and petitioner each had a gun in August of 1992 (around the time the crimes were committed). The additional testimony was not so powerful that every objectively reasonable lawyer who had the evidence would have used it.

Furthermore, even if counsel's failure to call Rhodas and Smolko was not a tactical choice, but the result of counsel's failure to perform a reasonable investigation to discover these witnesses, petitioner still is not entitled to federal habeas relief. Again, the proposed testimony is almost entirely cumulative to that of the witnesses counsel called. *See Williams v. Allen*, 458 F.3d 1233, 1245 (11th Cir. 2006) (holding that state court reasonably concluded that petitioner failed to prove prejudice under *Strickland*, where petitioner's proposed new evidence was merely cumulative and elaborated on other evidence that counsel presented); *Van Poyck v. Florida Dep't of Corrections*, 290 F.3d 1318, 1324 n. 7 (11th Cir. 2002) (noting that "[a] petitioner cannot establish ineffective assistance by identifying additional

evidence that could have been presented when that evidence is merely cumulative."); *Glock v. Moore*, 195 F.3d 625, 636 (11th Cir. 1999) (concluding that petitioner could not show prejudice "where much of the new evidence that [petitioner] presents is merely repetitive and cumulative to that which was presented at trial."). The state court reasonably rejected petitioner's contention that his counsel's failure to call (or discover) Rhodas' and Smolko's testimony prejudiced him under *Strickland*. Petitioner is not entitled to federal habeas relief on this claim.

> Ground 3.    Denial of Due Process and Trial by Jury When Petitioner Was Deprived of Twelve-Person Jury. (Doc. 1, p. 5).

Petitioner next claims that upon retrial he was denied a jury of twelve as required for a capital first-degree murder trial, in violation of Florida's Constitution and the United States Constitution. Respondent concedes that petitioner exhausted his state court remedies with respect to this claim by raising it at trial and on direct appeal. (Doc. 25, pp. 32-33).

Prior to petitioner's second trial, the defense argued to the court that it was entitled to a 12-person jury because petitioner was on trial for the capital offense of first degree murder. The State argued that petitioner had no right to a 12-person jury because double jeopardy barred a death sentence at the second trial.[10] The trial court ruled that the case would be tried with a 6-person jury. At retrial, the 6-person jury found petitioner guilty of first degree murder and armed robbery.

> A.    Clearly Established Federal Law

The Sixth Amendment to the Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the United States Supreme Court held that the Fourteenth Amendment guarantees a right to trial by jury in all criminal cases that -- were they to be tried in a federal court -- would come within the Sixth Amendment's guarantee. Two years later, in *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the Court addressed the

---

[10]Because the jury at the first trial had recommended a life sentence, and the trial judge had imposed a life sentence, double jeopardy barred a death sentence at the retrial.

question whether the Sixth Amendment requires a jury of a particular number. *Id.*, 399 at 87, 90 S.Ct. at 1898. The Court answered the question in the negative, holding that "the 12-man panel is not a necessary ingredient of 'trial by jury,' and that [the state court's] refusal to impanel more than the six members provided for by Florida law did not violate petitioner's Sixth Amendment rights as applied to the States through the Fourteenth [Amendment]." *Id.* The Court noted that the history of the development of trial by jury in criminal cases "afford[ed] little insight into the considerations that gradually led the size of that body to be generally fixed at 12," and that "while sometime in the 14th century the size of the jury at common law came to be fixed generally at 12, that particular feature of the jury system appears to have been a historical accident, unrelated to the great purposes which gave rise to the jury in the first place." *Id.*, at 87, 89-90, 90 S.Ct. at 1899-1900 (footnotes omitted). The Court concluded that "this accidental feature of the jury" had not "been immutably codified into our Constitution," and that there was no Constitutional guarantee to a 12-person jury. *Id.* at 87, 89-90, 90 S.Ct. at 1899-1900 (footnotes omitted); *see id.*, at 100, 90 S.Ct. at 1905 ("[T]he 12-man requirement cannot be regarded as an indispensable component of the Sixth Amendment."). In dictum, the Court noted that its holding "does no more than leave these considerations to Congress and the States, unrestrained by an interpretation of the Sixth Amendment that would forever dictate the precise number that can constitute a jury." *Id.* at 103, 90 S.Ct. at 1907.

### B.   Federal Review of State Court Decision

Petitioner raised this issue on direct appeal. The First DCA held that petitioner "was not entitled to a 12-person jury because the death penalty was not a possible penalty in this case as a matter of law." (Ex. R). The court explained:

> In *State v. Hogan*, 451 So.2d 844 (Fla. 1984), the supreme court stated that for purposes of defining "capital" under the statute and the rule, "[W]e hold that a capital case is one where death is a *possible* penalty." *Id.* at 845 (emphasis added). In appellant's original trial, although the State sought the death penalty, the jury came back with a recommended life sentence which was imposed by the trial court; therefore at appellant's subsequent retrial, he could not be subject to the death penalty again under principles of double jeopardy. *See*

*Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).

(Ex. R, pp. 3) (footnote omitted).[11]  Although the First DCA certified the question to be one of great public importance, the Florida Supreme Court declined jurisdiction. *Hall v. State*, 865 So.2d 480 (Fla. 2003) (Table).

The United States Supreme Court's holding in *Williams* disposes of petitioner's claim that the Sixth and Fourteenth Amendments required that he be tried by a jury of twelve.  The Constitution simply does not require it.[12]  The state court's denial of relief on this claim was neither contrary to, nor an objectively unreasonable application of clearly established federal law, and petitioner is not entitled to federal habeas relief.  *See, e.g., Cabberiza v. Moore*, 217 F.3d 1329, 1333 (11th Cir. 2000) (relying on *Williams v. Florida, supra*, to deny habeas relief on Florida prisoner's claim that the Sixth Amendment required that he be tried of first degree murder by a jury of twelve, rather than six).

> Ground 4.  Violation of Petitioner's Fourth Amendment Rights by Arresting Officers and Illegal Evidence Admitted at Trial.  (Doc. 1, p. 5).

Petitioner asserts that at the time of his arrest he was living in a tent, and that the Pennsylvania State police illegally searched the tent and found several items later used as evidence, including the .380 pistol shown to be the murder weapon and a Crown Royal bag allegedly similar to the bag petitioner was accused of taking from the victim.  Petitioner maintains that the police officers had no search warrant, nor was the search incident to his arrest because he was already in custody.  Petitioner admits that he did not present this claim to the state court on direct appeal because trial counsel failed to move to suppress the evidence or object to its admission at trial, and appellate counsel "was unaware of [the] circumstances involved."  (Doc. 1, p. 5).  Respondent asserts that this claim is procedurally defaulted.  (Doc. 25, pp. 46-48).

---

[11]The *Bullington* decision did not address the question whether the Constitution requires a jury of a particular number.  The state court relied on this decision to support its determination that the Double Jeopardy Clause barred the imposition of the death penalty in petitioner's retrial.

[12]Whether or not Florida law entitled petitioner to a twelve-person jury is a matter of state law, not federal constitutional law, and the state court decided the issue unfavorably to petitioner.

Respondent is correct.  State procedural rules do not provide for a second direct appeal; therefore, petitioner cannot now return to state court to present his Fourth Amendment claim.  The question is whether petitioner can excuse his default by relying on ineffective assistance of counsel to establish cause.  To support this proposition, petitioner states: (1) that prior to trial, trial counsel told him that the arresting officer had a search warrant at the time of his arrest; (2) that at the conclusion of petitioner's direct appeal, he received documents from his appellate attorney showing that Pennsylvania officers had only an arrest warrant, not a search warrant; and (3) that trial counsel's failure to discover this was the product of either constitutionally deficient performance or prosecutorial misconduct. (Doc. 34, p. 15).  Petitioner does not suggest that he ever presented this ineffective assistance claim to the state court.

An ineffective assistance of counsel claim asserted as cause for another procedurally defaulted federal claim can itself be procedurally defaulted, and, unless the state prisoner can satisfy the cause and prejudice standard for the procedurally defaulted ineffective assistance claim, that claim cannot serve as cause for the other procedurally defaulted claim.  *Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).  The record in this case demonstrates that petitioner has not presented to the state court an ineffective assistance claim based either on counsel's failure to move to suppress evidence seized from the tent, or on counsel's failure to discover the absence of a search warrant.  Petitioner cannot now return to state court to assert this additional instance of ineffective assistance, as Florida Rule of Criminal Procedure 3.850(f) bars the filing of second or successive post-conviction motions.[13]  The ineffective assistance claim is therefore procedurally

---

[13]Florida courts consistently apply the rule that a second or successive post-conviction motion which asserts new and different grounds than a defendant's first motion is an abuse of process unless the defendant shows justification for his failure to raise the new ground in his first post-conviction motion (a showing petitioner here cannot make).  *See* Fla. R. Crim. P. 3.850(f); *Spaziano v. State*, 545 So.2d 843, 844 (Fla.1989) (holding that second 3.850 motion must be summarily denied where first motion raised claim of ineffective assistance of counsel, second motion sought to raise additional grounds for that ineffectiveness, and second motion did not allege defendant was precluded from asserting the additional grounds in the first motion); *Christopher v. State*, 489 So.2d 22 (Fla. 1986) (holding that "where an initial motion for postconviction relief raises the claim of ineffective assistance of counsel, the trial court may summarily deny a successive motion which raises additional grounds for ineffective assistance of counsel); *Washington v. State*, 876 So.2d 1233,

defaulted.   Petitioner alleges no cause for his failure to raise the ineffective assistance claim in state court.  In fact, he admits that he was aware of this claim upon the conclusion of his direct appeal.  (Doc. 34, p. 15).  Therefore, the ineffective assistance claim cannot serve as cause for petitioner's default of his Fourth Amendment claim.   Because petitioner has not made the requisite showing to excuse his default, this court will not review his Fourth Amendment claim here.

> **Ground 5.** **Denial of Effective Assistance of Counsel when Counsel Failed to Limit Collateral Crime Evidence and Failed to Object to Improper Argument Concerning the Collateral Crime Evidence.** (Doc. 1, p. 6).

At petitioner's retrial, the State presented testimony of Bonnie Bishop that petitioner robbed her with a small black pistol prior to committing the instant murder.  Petitioner complains that because counsel failed to object "effectively," the evidence was admitted.  Specifically, petitioner maintains that instead of seeking to exclude the evidence as improper collateral crime evidence (which the defense had argued unsuccessfully in petitioner's appeal of his first conviction), counsel should have moved to limit the use of Bishop's testimony to the sole issue of proving his possession of a black handgun, thereby prohibiting its consideration for any other purpose.  (Doc. 1, p. 6; doc. 34, pp. 18-19).[14]  Petitioner further asserts that in closing argument the prosecutor referenced the prior robbery in an improper way -- to show petitioner's propensity to commit robberies -- and that counsel failed to object to the improper argument.   Respondent contends this claim is procedurally defaulted because petitioner did not raise a claim of error regarding the introduction of collateral crime evidence as a substantive claim on direct appeal, or as one of ineffective assistance in his post-conviction motion.  Therefore, this court should not review it.

---

1234 (Fla. Dist. Ct. App. 2004) (petition for habeas corpus properly denied as successive 3.850 motion and thus abuse of process where defendant previously filed 3.850 motion asserting several grounds of ineffective assistance of counsel and either re-stated same issues in habeas petition or asserted grounds which could or should have been addressed in previous 3.850 motion).

[14]Just prior to Bishop's testimony, the court instructed the jury that the testimony should be considered "for the limited purpose of proving . . . motive, opportunity, intent, preparation, plan, knowledge, identity, the absence of mistake or accident on the part of the defendant." (Ex. M, p. 214).

Petitioner responds that this claim was exhausted because he raised the issue of collateral crime evidence on direct appeal after his <u>first</u> trial.  (Doc. 34, p. 18).  However, this explanation fails to address why, in petitioner's Rule 3.850 motion following retrial, petitioner did not raise the ineffective assistance claim he now presents -- counsel's failure to move to limit (as opposed to exclude) the Bishop testimony in the manner petitioner suggests, and counsel's failure to object to improper closing argument.  Petitioner has made none of the requisite showings to excuse his default.  Therefore, this court will not consider the ineffective assistance claim he now raises.

> **Ground 6.**  <u>Denial of Sixth Amendment Right to Counsel When Law Enforcement Deliberately Induced Petitioner to Make Incriminating Statement to An Informant Timothy Johnson After Petitioner had Invoked His Right to Counsel.</u>  (Doc. 1, p. 6).

At petitioner's retrial, the prosecutor used a jail house snitch, Timothy Johnson, to testify to incriminating statements petitioner made while in jail.  Petitioner maintains that this violated his Sixth Amendment rights because Johnson was acting as "an agent of the State" and elicited the incriminating statements after petitioner had invoked his right to counsel.  Petitioner complains that the testimony was admitted into evidence without objection because counsel was ineffective in failing to "strenuously object" to the "illegal testimony."  He admits that he did not raise this issue on direct appeal, explaining that "[t]rial counsel failed to object to the testimony, and failed to investigate thoroughly the informant's relationship with law enforcement.  Appellant recently discovered informant's long-term relationship only by chance."  (Doc. 1, p, 7).  In his reply, however, petitioner changes course, arguing that his failure to raise the issue on direct appeal was not the result of ineffective assistance, but of the State's concealment of Johnson's status as an informant such that the information was not reasonably available to counsel.  (Doc. 34, pp. 20-23).  Respondent contends this claim is procedurally defaulted; therefore this court should not review it.

Regardless of petitioner's failure to exhaust his state court remedies, this court should deny relief because petitioner's allegations fail to make out a colorable Sixth Amendment violation.  *See* 28 U.S.C. § 2254(b)(2) (providing that habeas relief

may be denied on the merits, notwithstanding the petitioner's failure to exhaust state remedies); *see also, e.g., Stano v. Butterworth*, 51 F.3d 942, 946 n. 1 (11th Cir. 1995) (noting that because the habeas petitioner's Sixth Amendment claim was being rejected on the merits, the court need not decide whether the claim was procedurally barred).

The Sixth Amendment to the United States Constitution applies to post-indictment communications between the accused and agents of the government. Such agents are prohibited from deliberately eliciting incriminating statements in the absence of counsel after the accused has been indicted. *See Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 1203, 12 L. Ed. 2d 246 (1964). "[T]he clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams*, 430 U.S. 387, 400, 97 S. Ct. 1232, 1240, 51 L. Ed. 2d 424 (1977). In *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), the Court applied the principle of *Massiah* in the jailhouse informant context. "In order to establish a violation of the Sixth Amendment in a jailhouse informant case, the accused must show (1) that a fellow inmate was a government agent, and (2) that the inmate deliberately elicited incriminating statements from the accused." *Lightbourne v. Dugger*, 829 F. 2d 1012, 1020 (11th Cir. 1987) (citing *Henry*, 447 U.S. at 270, 100 S. Ct. at 2186; *United States v. Taylor*, 800 F. 2d 1012, 1015 (10th Cir. 1986)). No bright-line rule exists for determining whether an individual is a government agent for purposes of the Sixth Amendment's right to counsel. *See Depree v. Thomas*, 946 F. 2d 784, 793-94 (11th Cir. 1991). That determination must be made on the facts and circumstances of each case. *See id.* at 794; *Lightbourne, supra*, 829 F. 2d at 1020. "At a minimum, however, there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place." *Depree, supra*, 946 F. 2d at 794 (citing *Lightbourne*, 829 F. 2d at 1020). Concerning such "deliberate" elicitation, the United States Supreme Court has commented that:

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth

> **Amendment is not violated whenever–by luck or happenstance–the state obtains incriminating statements from the accused after the right to counsel has attached," a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police.   Rather the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.**

*Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S. Ct. 2616, 2630, 91 L. Ed. 2d 364 (1986) (citing *Henry*, 477 U.S. at 276, 106 S. Ct. at 2189)).

In the instant case, petitioner alleges the following in support of his claim that Johnson was a government agent.  He states in his petition that Johnson was a "police informant;" that Johnson was a "jailhouse snitch . . . acting as an agent of the State," and that Johnson had a "long-term relationship" with the State.  (Doc. 1, pp. 6-7).  In his reply, which is neither sworn nor submitted under penalty of perjury, he additionally states:

> **During both original trial and retrial, prosecution maintained that Timothy Johnson was testifying as a good-faith citizen, under no relationship with law enforcement and under no inducement or incentive.  In fact, Timothy Johnson was deliberately placed in defendant's cell by Escambia County sheriff's officers for the purpose of eliciting statements from the defendant.  Timothy Johnson was known to Escambia County police as a confidential informant. Escambia County police had been notified that defendant had invoked his right to counsel.**
>
> **Petitioner's trial counsel was not told, nor was the trial court notified, that Timothy Johnson was a known informant with a long-standing relationship with police.  The State engaged in deliberate concealment of this fact, withholding the information from the defense.**
>
> **. . . .**
>
> **At no time during either trial, direct appeals and collateral attacks was the information available or revealed to petitioner or defense counsel.  Johnson's status as an informant remained unknown until December, 2005, when another inmate told petitioner that Tim Johnson had been a known informant for the Escambia County Sherriff's [sic] Office for years.  Petitioner having never been a resident of Escambia**

County and having no contacts there, could not have learned this fact earlier.

By their very nature, a confidential informant is operating in secret. The prosecution and law enforcement rely upon the secrecy of their relationship with a confidential informant to gain information. The State goes to great lengths to keep the relationship from becoming known. As such, the petitioner was unable to discover this fact until years after the trial, when a fellow inmate from Escambia County, familiar with Tim Johnson brought it to his attention.

. . . .

Had the prosecution informed the defense at trial, of the State's relationship with Johnson during the time Johnson was deliberately placed, housed, with defendant to illicit [sic] incriminating statements, any competent attorney would have rightly brought this to the court's attention and moved to suppress not only Johnson's testimony, but all evidence obtained as a result of the informant's illegal testimony & activity, which includes the "collateral-crime" evidence of a fruit-stand robbery in Georgia, the testimony of Bonnie Bishop, and all evidence and testimony related to or derived from them.

(Doc. 34, pp. 20-22) (citations omitted).

As a preliminary matter, the trial transcript conclusively rebuts petitioner's assertion that the State represented Timothy Johnson as "a good-faith citizen, under no relationship with law enforcement and under no inducement or incentive." On direct examination at petitioner's retrial, the State elicited testimony from Johnson that he had been convicted of twelve felonies and was currently serving a term of imprisonment. (Ex. M, p. 230). Additionally, the prosecution and the defense questioned Johnson extensively about his relationship with the prosecutor as well as how his reporting of petitioner's statements to the prosecutor came about. Johnson testified on direct that at the time he met petitioner, he was in the Escambia County Jail awaiting trial on an escape charge. (*Id.*, p. 236). Upon his arrival, he was housed in a two-man cell with petitioner. (*Id.*, pp. 245-46). At some point petitioner told Johnson that he was in jail for murder, and described how it occurred. (*Id.*, pp. 230-34). Petitioner also "bragged that he was prime time, he had been on television or something to that effect." (*Id.*, p. 234). After petitioner revealed this information, Johnson contacted jail officials and said he wanted to talk to the prosecutor in

petitioner's case.  (*Id.*, p. 236).  Johnson admitted that he wrote a letter to the prosecutor asking him if there was anything he (the prosecutor) could do on Johnson's behalf for the escape charge he was facing at the time, and that after he testified at petitioner's first trial, he received a reduction in his sentence.  (*Id.*, p. 237).  On cross-examination, defense counsel elicited testimony from Johnson that he had been facing 7-9 years in prison on the escape charge, that after he informed the prosecutor of petitioner's statements (but before he testified at petitioner's first trial), he received a sentence of 11 months in the county jail on the escape conviction, and that pursuant to an agreement with the prosecutor, Johnson's sentence was later reduced to time served after he testified at petitioner's first trial.  (*Id.*, pp. 241-43, 247-49).  Defense counsel also elicited testimony from Johnson that after he initially gave the prosecutor information about petitioner's statements, Johnson was given a more favorable housing assignment at the jail (he was moved from the sixth floor where the violent inmates were housed).  (*Id.*, p. 244).

The key inquiry to the agency requirement, however, is whether petitioner has alleged facts which, if true, establish that <u>at the time petitioner made his incriminating statements to Johnson</u>, *i.e.*, <u>before</u> Johnson contacted the prosecutor about petitioner's statements, Johnson had been promised money or other consideration from the State in exchange for reporting incriminating statements to the authorities.  Although petitioner states in conclusory terms that Johnson was "a jailhouse snitch . . . acting as an agent of the State," there are no allegations that could factually support a finding that Johnson was a government agent.  There is no allegation that Johnson received instructions from the police or from the prosecutor to do anything about petitioner--even to listen passively.  The strongest allegation asserted in the petition is that Johnson was "a known informant" with "a long-term relationship" with law enforcement.  This allegation, even if true, does not support a finding of a *Henry* violation.  *United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir. 1986) ("The protections of the Sixth Amendment right to counsel enunciated in . . . *Henry* is inapplicable when, after the right to counsel has attached, statements by a defendant are made to an individual who is not an agent for the Government, although he may be a Government informant.  This is so regardless of whether the

statements were deliberately elicited" by an informant.); *see also e.g., Banks v. Dretke*, 540 U.S. 668, 690, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004) (noting that in state post-conviction court, inmate failed to produce evidence that witness had served as police informant in inmate's case, where inmate merely appended to his state court application a "hardly probative statement" that the witness "was well-connected to law enforcement people."); *United States v. Goodrich*. 2007 WL 1412393, at *3-4 (M.D. Ala. 2007) (denying relief on *Henry* claim without an evidentiary hearing, although defendant alleged that fellow inmate was directed by the Government to gather information that would assist its prosecution of criminal cases, the defendant failed to point to any evidence demonstrating that the fellow inmate received instructions from the police, from the prosecutors, or from anyone else to do anything concerning defendant's case; further, although defendant maintained that the fellow inmate was promised a downward departure at sentencing in his own case and that this arrangement made the fellow inmate a government agent for Sixth Amendment purposes, the only evidence offered to support the existence of an agency relationship was the timing of defendant's conversation with the inmate and the inmate's plea agreement with the government, neither of which was sufficient to state a colorable *Henry* claim).

In the instant case, petitioner's allegations are insufficient to establish that Johnson was an agent of the State at the time petitioner made his incriminating statements in 1992.[15]   Petitioner's conclusory allegation that Johnson was a government agent, unaccompanied by a proffer of evidence that he was anything more than an "informant," is insufficient to support an evidentiary hearing, much less habeas relief, especially where the evidence at trial strongly suggests that Johnson acted solely on his own to secure a better sentence for himself.   As petitioner's allegations fail to state a colorable Sixth Amendment violation, he is not entitled to habeas relief on this claim.

---

[15]The trial testimony establishes that petitioner made the incriminating statements to Johnson in 1992.  (Ex. M, pp. 229-30).

**Ground 7.     Denial of Due Process and Speedy Trial Rights Following State's Frivolous Appeal of Order Granting New Trial.  (Doc. 1, p. 7).**

As his final ground for relief, petitioner asserts that his speedy trial rights were violated when he was not retried within 90 days of the state court's order vacating his judgment and sentence and ordering a new trial.  Petitioner states that he presented this claim to the state courts by filing a notice of expiration of speedy trial and a motion for discharge, and by appealing the denial thereof.  (Doc. 1, p. 7).  Respondent asserts that petitioner's claim is not cognizable on federal habeas review because it is based solely on a perceived error of state law, even though it is couched in terms of due process.  (Doc. 25, pp. 52-55).  Respondent alternatively argues that even if Ground 7 is construed as raising a federal claim, petitioner cannot establish a constitutional speedy-trial violation because: (1) he filed a waiver of speedy trial and (2) he procedurally defaulted any federal claims arising from the speedy trial issue because when he raised the issue in state court he only perfunctorily cited  to the Sixth and Fourteenth Amendments and did not fairly apprise the state court of the federal nature of his claim.  (*Id.*, p. 58).

The foundation of petitioner's claim, as stated in the petition, is that because the State failed to re-try him within the 90 days provided by Florida's speedy trial rule and failed to seek a stay as required by Florida law, petitioner was entitled to discharge, and that the state courts "erred" when they "improperly denied" his motion.  (Doc. 1, p. 7).  This claim is not cognizable on federal habeas.  Federal habeas corpus is available for the vindication of rights existing under federal constitutional law, not rights existing solely under state rules of procedure.  *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 479-80, 116 L.Ed.2d 385 (1991) (holding that errors that do not infringe upon a defendant's constitutional rights provide no basis for federal habeas corpus relief); *Wainwright v. Goode*, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983); *Barclay v. Florida*, 463 U.S. 939, 958-659, 103 S.Ct. 3418, 3429, 77 L.Ed.2d 1134 (1983) ("Mere errors of state law are not the concern of this court . . . unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution.") (citations omitted); *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 2976, 73 L.Ed.2d 1361 (1981); *Tejada v. Dugger,* 941 F.2d 1551

(11th Cir. 1991) ("[A] state's interpretation of its own laws provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."). Thus, petitioner's claim as stated in the petition does not warrant federal habeas relief. *See, e.g., Smith v. Colman*, 528 F.2d 1362, 1363-64 (5th Cir. 1976) (holding that to gain release by federal habeas corpus, Florida prisoner was required to demonstrate not that the State had violated its own speedy trial rule but that his Sixth Amendment right to speedy trial had been denied);[16] *Moore v. Nelson*, 49 Fed.Appx. 250, 253 (10th Cir. 2002) (holding that state prisoner's speedy trial claim, based solely on state law, was not cognizable on federal habeas review); *Young v. Crosby*, 2005 WL 1205398 at *5 n. 3 (M.D. Fla. 2005) (same).

Recognizing this deficiency, and in response to respondent's contention that Ground 7 is based purely on a perceived error of state procedural law, petitioner attempts in his reply to broaden his claim to one of constitutional dimension by discussing the factors relevant to a constitutional speedy trial claim, such as the length and reason for the delay and how the delay prejudiced him. However, even giving petitioner the benefit of construing his petition together with his reply as asserting a violation of his Sixth and Fourteenth Amendment rights, and even giving petitioner the additional benefit of assuming (without deciding) that he presented the federal nature of his claim to the state courts, petitioner is not entitled to federal habeas relief.[17]

---

[16]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[17]Respondent also raises the issue of waiver, albeit in only conclusory fashion. Respondent states that "particularly where Petitioner filed a waiver of speedy trial, Petitioner has established no federal constitutional speedy-trial violation." (Doc. 25, p. 58). To the extent respondent suggests that petitioner waived all rights to assert a constitutional speedy trial claim, the undersigned disagrees. Petitioner's waiver of a speedy trial under Florida's speedy trial rule does not equate to a waiver of his constitutional right to a speedy trial. As the Florida Supreme Court explained in discussing a related issue (whether a defendant's constitutional rights were violated when he had to elect between a speedy trial under Florida's speedy trial rule and adequate trial preparation):

The right to speedy trial provided in rule 3.191 is not coextensive with the broader constitutional right to a speedy trial. No constitutional right exists to a trial within 175 days of arrest. . . . Florida's speedy trial rule is a procedural protection and, except for the right to due process under the rule, does not reach constitutional dimension. As opposed to the right provided in the rule, the constitutional speedy trial period is measured by tests of reasonableness and prejudice, not specific

## A.    Sixth Amendment Right to a Speedy Trial

In *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the Supreme Court expressly rejected an "inflexible . . . fixed-time period" approach to determining whether a defendant has been denied his constitutional right to a speedy trial, stating there is "no constitutional basis for holding that the speedy trial right can be quantified into a specific number of days or months." *Id.*, 407 U.S. at 523, 529-30, 92 S.Ct. at 2188, 2191.   The Court went on to hold that there are four factors which must be considered in determining if the constitutional right to a speedy trial has been violated:   "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.*, 407 U.S. at 530, 92 S. Ct. at 2192 (footnote omitted).[18]   Under *Barker* the length of the delay must

---

numbers of days. . . .

. . . The speedy trial rule is a procedural device only and not a constitutional right.   Once the speedy trial rule has been waived, it is supplanted by the constitutional speedy trial period which is measured in tests of reasonableness and prejudice, not specific numbers of days.

*State v. Naveira*, 873 So. 2d 300, 307 (Fla.  2004) (internal quotation marks and citations omitted). Thus, the undersigned finds that petitioner has not waived his constitutional speedy trial claim or his due process claim.

[18]The Supreme Court has explained the four-part test as follows:

The length of the delay is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.  Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. . . .

Closely related to length of delay is the reason the government assigns to justify the delay.  Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

. . . Whether and how a defendant asserts his right is closely related to the other factors we have mentioned.  The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain.  The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary

be "presumptively prejudicial" in order to trigger an inquiry into the other three factors. *United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003); *United States v. Register*, 182 F.3d 820, 827 (11th Cir. 1999) ("The first factor serves a triggering function; unless some 'presumptively prejudicial' period of delay occurred, we need not conduct the remainder of the analysis.") (citing *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192); *United States v. Schlei*, 122 F.3d 944, 987 (11th Cir. 1997); *Ringstaff v. Howard*, 885 F.2d 1542, 1543 (11th Cir. 1989).

The record in this case reveals the following.  On April 26, 2000 the state court entered an order granting petitioner's motion for post-conviction relief, vacating petitioner's judgment and sentence, and granting a new trial.  (Ex. B).  On May 8, 2000, the State filed a Notice of Appeal of that order.  (Ex. C).  On May 12, 2000 petitioner, represented by counsel, filed a Notice of Cross-Appeal. (Ex. E, Mem.; *see also* www.1dca.org, Case No. 1D00-2426).  On September 25, 2000 petitioner filed a Notice of Expiration of Speedy Trial pursuant to Rule 3.191(h), (m), and (p) of the Florida Rules of Criminal Procedure.   (Ex. D).  The State moved to strike the notice, arguing that the speedy trial time had not yet begun, because under Florida Statute § 924.19 the State's pending appeal operated as a stay of further proceedings in the trial court.  (Ex. E).  On October 10, 2000 the trial court agreed and granted the State's motion.  (Ex. F).  On October 19, 2000 defense counsel filed a Motion for Discharge pursuant to Rule 3.191(p)(3) of the Florida Rules of Criminal Procedure. (Ex. G).  Petitioner argued that he had a right to a speedy trial under the state and federal constitutions, and that such rights had been violated.  After a hearing, the

---

weight in determining whether the defendant is being deprived of the right.  We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

A fourth factor is prejudice to the defendant.  Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.  This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.  Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.  If witnesses die or disappear during a delay, the prejudice is obvious.  There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

*Id.*, 407 U.S. at 530-32, 92 S.Ct. at  2192-93 (footnotes omitted).

trial court denied the motion.  (Exs. H, I). Petitioner filed a Notice of Appeal, which the First DCA converted to a petition for writ of prohibition.  (Exs. I, J).  On February 16, 2001 the First DCA affirmed the trial court's order granting a new trial.  *Hall v. State*, No. 781 So.2d 1088 (Fla. Dist. Ct. App. 2001) (Table) (copy at Ex. J, App.).  The mandate issued March 6, 2001. *See* www.1dca.org. Case No. 1D00-2426. Thereafter, on June 21, 2001 the First DCA denied the petition for writ of prohibition, citing Florida Rule of Criminal Procedure 3.191(m) and *State v. Rohm*, 645 So.2d 968 (Fla. 1994).  (Ex. L).  On September 25, 2001 petitioner filed a waiver of his right to speedy trial "with the understanding that his re-trial is scheduled for the week of December 17, 2001."  (Ex. FF; doc. 34, p. 27).  Petitioner's retrial commenced on December 17, 2001.  (Ex. M).

Applying the *Barker* factors to the foregoing, the length of delay in this case is not sufficient to require further inquiry.  There was a delay of only approximately nine months from the day the order occasioning the retrial became final (March 6, 2001) to the day petitioner's second trial commenced (December 17, 2001).  Although there is no precise time for the constitutional right to a speedy trial to be implicated, *Barker*, 407 U.S. at 521, 92 S.Ct. at 2187 ("We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate."), a one-year period has been recognized as the amount of time necessary to require a speedy trial analysis.  *See Doggett v. United States*, 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) ("[T]he lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year. . . . [I]t simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry."); *Dunn*, 345 F.3d at 1296 ("A delay is considered presumptively prejudicial as it approaches one year."); *United States v. DeRose*, 74 F.3d 1177, 1185 (11th Cir. 1996) ("[E]ight-month delay is insufficient to merit a Sixth Amendment speedy trial violation inquiry."); *United States v. Rankin*, 572 F.2d 503, 505 (5th Cir. 1978) ("A seven-month delay is not presumptively prejudicial. . . ."); *United States v. Maizumi*, 526 F.2d 848, 851 (5th  Cir. 1976) ("The [10-month] delay per se was not unreasonably long"); *Young v. Crosby, supra*, 2005 WL 1205398 at  *5 n. 3 (Even if state prisoner had presented his claim as a constitutional right to speedy trial, the

claim would be without merit because his 6-month delay did not even trigger a *Barker* inquiry into a constitutional claim of denial of speedy trial).   Accordingly petitioner's nine-month delay does not trigger a *Barker* inquiry into a constitutional speedy trial claim.

Even if, as petitioner argues (doc. 34, pp. 24, 29), the speedy trial period commenced the date the trial court granted a new trial (April 26, 2000), thereby rendering the delay in excess of one year, petitioner still has not established a violation of his speedy trial right.   Because a 20-month delay is presumptively prejudicial under the cases cited above, the focus then turns to the reason for the delay.  *See United States v. Dennard*, 722 F.2d 1510, 1513 (11th Cir. 1984) (15-month delay raises presumption of prejudice).   If the reason for delay also weighs heavily against the State, then petitioner need not show actual prejudice to prevail, *Moore v. Arizona*, 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973), but if the delay was reasonable, then he must show actual prejudice.  *United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir. 1985); *Dennard, supra*, at 1513-14 .

The record establishes that the reason for the delay between April 26, 2000 and March 6, 2001 was the pendency of the appeal of the order granting petitioner a new trial.  This delay does not weigh against the State for two reasons.  First, just as courts have found reasonable the delay while pretrial motions and interlocutory appeals are resolved, it was reasonable for the State to wait until the appeal of the order granting a new trial was final before bringing petitioner to trial.  *See United States v. Loud Hawk*, 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) (Government's interlocutory appeal which took two years accorded little weight in *Barker* balancing); *Ringstaff*, 885 F.2d at 1544 (9-month delay while State waited for state supreme court to issue decision determining constitutional validity of death penalty statute was justified); *Government of the Virgin Islands v. Burmingham*, 788 F.2d 933 (3rd Cir. 1986) (18-month delay between indictment and trial justified where Territorial Court sought clarification of applicability of Speedy Trial Act to criminal proceedings in its court); *United States v. Guerrero*, 756 F.2d 1342, 1349-50 (9th Cir. 1984) (per curiam) (20-month delay during appeal of pretrial suppression order was justified and did not weigh at all against the government); *United States ex rel.*

Case 5:06-cv-00030-RS-MD   Document 37   Filed 10/17/07   Page 40 of 43


*Fitzgerald v. Jordan*, 747 F.2d 1120 (7th Cir. 1984) (speedy trial right not violated by 8-month delay while State appealed judge's decision declaring unconstitutional a state statute mandating trial as an adult for 16-year-old defendant charged with armed robbery); *United States v. Herman*, 576 F.2d 1139 (5th Cir. 1978) (18-month delay while state appealed pretrial suppression of incriminating statements made by the defendant was justified).  There is no evidence that the delay was due to bad faith or a dilatory purpose by the State.  *See Loud Hawk*, 474 U.S. at 316, 106 S.Ct. at 656; *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192 ("[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government").

The second reason this period does not weigh against the State is that petitioner was partly responsible for the appeal.  The record establishes, and petitioner does not dispute, that he filed a cross-appeal of the order granting a new trial.

The delay between March 6, 2001 and June 21, 2001 is not attributable to the State, as petitioner's petition for writ of prohibition was pending until the latter date, and the trial court lacked jurisdiction to proceed until that proceeding concluded.

Neither party has accounted for the period between June 21, 2001 and September 25, 2001.  The state court docket sheet reveals that a copy of the First DCA's order denying the writ of prohibition was not received by the trial court until August 9, 2001.  This may account for some delay, but there is no indication that the prosecution was responsible for it.  Regardless, because petitioner has not provided any reason for weighing the 3-month delay heavily against the State, this court will not do so.

The period from September 25, 2001 to petitioner's trial date on December 17, 2001 is excused from the speedy trial computation, because on September 25, 2001 petitioner waived his right to a speedy trial and agreed to the December trial date. *See Beard v. Secretary for Dep't of Corrections*, 161 Fed.Appx. 824, 827 (11th Cir. 2005) (holding petitioner responsible for period from his arrest to his first trial date because defense counsel waived petitioner's right to a speedy trial and agreed to the first trial date).

Based on the foregoing, petitioner has not established that the second *Barker* factor weighs heavily against the State.  He is therefore required to show he suffered actual prejudice in order to prevail.[19]  To determine whether petitioner suffered prejudice the court considers three factors: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired.  *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193.  None of these factors supports petitioner's argument.

In his reply, petitioner asserts that he was prejudiced by the delay because, although the trial court ordered that he be returned to the Escambia County Jail, he remained confined at a state prison where "[o]ther prisoners, jealous of petitioner's successful appeal and aware of his precarious vulnerability, threatened, extorted and even physically assaulted petitioner."  (Doc. 34, p. 28).  He further alleges that prison staff "repeatedly discouraged or frustrated attempts by trial counsel to reach petitioner by calls or visits needed to prepare for trial."  (*Id.*, p. 29).  Finally, petitioner contends that he was prejudiced because in the time between the order granting a new trial and his retrial, one of his attorneys became ill and the September 11, 2001 terrorist attacks occurred.  (*Id.*).  These allegations, taken individually or collectively, are insufficient to establish actual prejudice from the delay in his retrial.  The alleged injuries are not attributable to the State, and are unrelated to the prosecution's delay in retrying petitioner.  Furthermore, petitioner has not demonstrated how these circumstances actually impaired the defense on retrial.  No witnesses for the defense at the first trial were unable to testify at the second.  Nor has petitioner alleged facts showing that his pre-trial confinement was oppressively long.  *See generally, United States v. Varella*, 692 F.2d 1352, 1359 (11th Cir. 1982) (holding that, "[i]n the absence of a showing that defendant suffered some particular injury, such as lost evidence or prolonged pretrial incarceration, from the delay in bringing him to trial, court must presume that defendant relied on the anxiety inherent in any

---

[19]The third factor, petitioner's assertion of his right, weighs in his favor, as he raised the speedy trial issue early by filing a notice and motion for discharge.  However, because petitioner has not established that the first three *Barker* factors weigh heavily against the government, he must establish that he suffered actual prejudice from the delay in his trial.  *See United States v. Davenport*, 935 F.2d 1223, 1239 (11th Cir. 1991); *Ringstaff v. Howard, supra*.

delay; standing alone, however, that form of prejudice is insufficient to warrant reversal of a conviction on the ground of denial of the right to a speedy trial."). Petitioner's allegations are insufficient to warrant habeas relief on the ground of denial of petitioner's constitutional right to a speedy trial.

### B.     Fourteenth Amendment Due Process Claim

The second aspect of petitioner's claim is that his due process rights were violated when the state court "ignored its own rules" and "dispensed with the protections afforded by [state] law" in denying his motion for discharge and petition for writ of prohibition.  (Doc. 34, pp. 26, 27).  As previously discussed, state law issues may be reviewed in this federal forum only when the alleged errors were "so critical or important to the outcome of the trial to render the entire trial fundamentally unfair."  *Tejada*, 941 F.2d at 1560.  The Supreme Court "ha[s] defined the category of infractions that violate 'fundamental fairness' very narrowly." *Estelle*, 502 U.S. at 352, 110 S.Ct. 668.  For the reasons that follow, the undersigned concludes that the instant case is not one in which there were such critical errors, if indeed there were any errors, that a constitutional violation is apparent.

In denying petitioner's petition for writ of prohibition, the First DCA cited Florida Rule of Criminal Procedure 3.191(m) and *State v. Rohm*, 645 So.2d 968 (Fla. 1994).  (Ex. L).  Rule 3.191(m) provides:

> **(m)  Effect of Mistrial; Appeal; Order of New Trial.  A person who is to be tried again or whose trial has been delayed by an appeal by the state or the defendant shall be brought to trial within 90 days from the date of declaration of a mistrial by the trial court, the date of an order by the trial court granting a new trial, the date of an order by the trial court granting a motion in arrest of judgment, <u>or the date of receipt by the trial court of a mandate, order, or notice of whatever form from a reviewing court that makes possible a new trial for the defendant, whichever is last in time</u>.  If a defendant is not brought to trial within the prescribed time periods, the defendant shall be entitled to the appropriate remedy as set forth in subdivision (p).**

*Id.*, (emphasis added).  Applying the foregoing to the facts of this case, it was not error for the First DCA to deny relief.  Contrary to the defense position that the speedy trial period began to run on the date the trial court granted a new trial, the plain language of the Rule makes clear that the 90-day speedy trial clock did not

begin to run until the trial court received the First DCA's mandate affirming its order granting a new trial.  This interpretation of Rule 3.191(m) is consistent with the Florida Supreme Court's interpretation of that provision in *State v. Rohm, supra,* when it held that "the 90-day speedy trial period provided in Florida Rule of Criminal Procedure 3.191(m) applies whenever a trial has been delayed by appeal."  Based on the foregoing, this court cannot say that the state courts violated petitioner's due process rights when they denied relief on his motion to discharge and petition for writ of prohibition.

Accordingly, it is respectfully RECOMMENDED:

That the petition for writ of habeas corpus (doc. 1) challenging the conviction and sentence in *State of Florida v. James L. Hall,* in the Circuit Court of Escambia County, Florida, case number case no. 92-4852, be DENIED and the clerk be directed to close the file.

At Pensacola, Florida this 17th day of October, 2007.


/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).